# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | EDCV 18-94-GW(SPx) | Date | November 21, 2018 |
|---|---|---|---|
| Title | *Aquastar Pool Products, Inc. v. Color Match Pool Fittings, Inc., et al.* | | |

Present: The Honorable     GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:     IN CHAMBERS - FINAL RULINGS ON *MARKMAN* CLAIM CONSTRUCTION**

Attached hereto is the Court's Final Rulings on *Markman* Claim Construction.

Initials of Preparer     JG     :

*Aquastar Pool Products, Inc. v. Color Match Pool Fittings, Inc.*; Case No. 5:18-cv-00094-GW-(SPx)
Final Rulings on *Markman* Claim Construction

## I.  INTRODUCTION

In this patent infringement action, Plaintiff Aquastar Pool Products, Inc. ("Aquastar") alleges that Defendant Color Match Pool Fittings, Inc. ("Color Match") infringes U.S. Patent 9,869,103 ("the '103 Patent").  *See* Docket No. 1; *see also* Docket No. 10.  Color Match has brought counterclaims against Aquastar, including counterclaims for infringement of three of Color Match's patents: U.S. Patents 6,209,586 ("the '586 Patent"), 6,340,035 ("the '035 Patent") and 6,557,588 ("the '588 Patent").  *See* Docket No. 37; *see also* Docket No. 40.

The parties have submitted a First Amended Joint Claim Construction and Prehearing Statement.  *See* Docket No. 60.  The parties filed Opening Claim Construction Briefs in support of their positions on June 29, 2018.  *See* Docket No. 62 (Color Match's Opening Claim Construction Brief); *see also* Docket No. 64 (Aquastar's Opening Claim Construction Brief).  The parties filed Responsive Claim Construction Briefs on July 20, 2018.  *See* Docket No. 66 (Color Match's Responsive Brief); *see also* Docket No. 67 (Aquastar's Responsive Brief); *see also* Docket No. 68 (Aquastar's Revised Responsive Brief).  Each party filed Reply Claim Construction Briefs on August 3, 2018.  *See* Docket No. 69 (Color Match's Reply Brief); *see also* Docket No. 70 (Aquastar's Reply Brief).

A claim construction hearing was held on November 19, 2018 at which a tentative order was circulated to the parties.  The matter was taken under submission.  The Court construes the disputed terms as stated herein and provides a supplemental briefing schedule regarding the invalidity of claims that depend from Claim 14 based on the determination that Claim 14 includes an indefinite claim limitation.

## II.  BACKGROUND

### A.  Aquastar's Patent

The '103 Patent issued on January 16, 2018.  It is titled "Low Profile Circular Drain with Water Stop for Swimming Pool" and generally relates to a "sump drain for connecting to a filtering system and embedding in the plaster floor of a swimming pool or spa."  '103 Patent at 2:17-19. The '103 Patent explains that previous pool sump drain designs resulted in shortcomings because after being embedded in plaster during installation, the surrounding plaster could form cracks over

time that could cause damage to the pool/pool drain.  *Id.* at 2:4-12.  In describing one embodiment of the disclosed invention, the '103 Patent explains,

> [t]he end result is a highly effective drain system flush with the surface of the pool, with plaster or other aggregate material having the same color and texture both inside and outside the concentric rings or circular grid. The drain has a nearly invisible, pleasing aesthetic appearance. The drain is [ ] safe . . . large enough to be unblockable by a single person. The drain is rugged, not susceptible to being easily damaged, and the water stop feature helps maintain the structural integrity of the surrounding plaster in the pool or spa floor for many years.

*Id.* at 4:53-63.

Figure 1 shows a "perspective view of a preferred embodiment circular drain assembly" of the '103 Patent.  *Id.* at 2:57-58.



*Fig. 1*

*Id.* at Figure 1.  In this embodiment, "the drain **10** has an annular ring-shaped body or chamber **12**."  *Id.* at 3:22-28.  It also includes an inner sidewall **14** and an outer sidewall **16**.  *Id.* at 3:27-31. The '103 Patent describes that "[t]he inner sidewall **16** [sic] has multiple openings or outlet ports **26** connecting to one or more conduits or pipes **28**. The conduits **28** extend radially inward to a central hub **30** that connects to the pump and filtering system **32** in the floor of the pool or spa." *Id.* at 3:41-45.  Additionally, "[t]he top side of the hub **30** includes a cap **34** on which a manufacture's logo . . . may be displayed, and the cap **34** is removable for purposes of cleaning out the drain **10** should it become clogged with debris."  *Id.* at 3:47-52.  The installation of the drain involves "a plastering cover **38** which is temporarily placed in the chamber **12** opening **18**,

to keep plaster from getting into the chamber **12** when the drain **10** is being installed in the floor of a pool or spa." *Id.* at 3:55-58.

    *B.  Color Match's Patents*

      The '586 Patent, '035 Patent, and '588 Patent are members of the same patent family and all relate to "drain covers for swimming pools and spas, and more particularly to an apparatus for applying an exposed aggregate or plaster finish to the top surface of drain covers." '586 Patent at 1:6-10; '035 Patent at 1:14-17.[1]  The '588 Patent is a continuation of the '035 Patent, which, in turn, is a continuation-in-part of the '586 Patent.  The Color Match Patents issued in May 2003, January 2002, and April 2001, respectively.  All three are titled "Aggregate Retaining Device for Drain Covers."

      The Color Match Patents explain that at the time of the invention, there existed "a need for a drain cover for swimming pool or spas that is less conspicuous," and particularly "for an apparatus or a method for matching a drain cover to the surrounding surface." '586 Patent at 2:7-10; '035 Patent at 2:13-18.  The Color Match Patents purport to solve these shortcomings by describing a drain cover that could be placed over a pool drain and be filled with the same plaster surface covering the rest of the pool.  '586 Patent at 2:13-15.

      Figure 2 shows a "general perspective view of one embodiment of an aggregate retaining device of the present invention." '586 Patent at 3:14-15; '035 Patent at 3:44-45.



FIG. 2

'586 Patent at Figure 2.[2]  The Color Match Patents describe that in this embodiment, "the aggregate retaining device **124** is generally a ring shaped structure that is mounted adjacent the upper surface **116** of the drain cover **100** . . . . Preferably, the device **124** comprises a sidewall **126** wherein the sidewall **126** defines a generally circular opening **125**." '586 Patent at 4:44-49; '035 Patent at

---

[1] Because the '035 Patent and the '588 Patent share substantially the same specification, the Court refers to the '035 Patent unless otherwise noted.
[2] Substantially the same figure is identified as Figure 2A in the '035 and '588 Patents.

5:14-19.  In addition, "the retaining device **124** further comprises a plurality of mounting brackets **134**a, **134**b wherein each bracket is a generally Z-shaped structure that is dimensioned to affix the retaining device **124** to the cover assembly **100**."  '586 Patent at 5:1-5; '035 Patent at 5:42-26.

Figure 4 shows a "general perspective view of the aggregate retaining device of [Figure] 2 mounted on the drain cover assembly . . . ."  '586 Patent at 3:19-21; '035 Patent at 3:50-52.



FIG. 4

'586 Patent at Figure 4; '035 Patent at Figure 4.  In Figure 4,

> [the] aggregate retaining device **124** [is] mounted on the drain cover assembly **100** of the preferred embodiment. . . . [T]he bottom surface **130** of the retaining device **124** rests adjacent the outer perimeter of the upper surface **116** of the cover assembly **100** so as to define a cavity **150** that will be filled with aggregate material. Preferably, the device **124** is fixedly attached to the cover assembly **100** via mounting screws or fasteners . . . .

'586 Patent at 5:58-66; '035 Patent at 6:41-49.  The Color Match Patents alternatively explain, "[w]hile the device of the present invention is adaptable to any drain cover having a general top surface, the device can also be made as an integral part of a drain cover assembly in other embodiments of the invention."  '586 Patent at 6:3-7; '035 Patent at 6:53-55.

## III.  LEGAL STANDARD

### A.  Claim Construction Generally

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  It is "a question of law in the way that we treat document construction as a question of law," with subsidiary fact-finding reviewed for clear error pursuant to Fed. R. Civ. P. 52(a)(6).  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837-40 (2015).  The claim language itself is the best guide to the meaning of

4

a claim term. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014). This is because the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (internal quotations omitted).

Although claims are read in light of the specification, limitations from the specification must not be imported into the claims. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The prosecution history may lack the clarity of the specification, but it is "another established source of intrinsic evidence." *Vederi*, 744 F.3d at 1382. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted). "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (internal quotations and citations omitted). But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else. "[A] claim term may be clearly redefined without an explicit statement of redefinition," so long as a person of skill in the art can ascertain the definition by a reading of the patent documents. *Id.* at 1320; *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic

5

evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotations omitted). Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review." *Teva*, 135 S. Ct. at 841, 849. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

B. *Means-Plus-Function Claiming Under 35 U.S.C. § 112 ¶ 6*

A claim limitation may be phrased as "a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112 ¶ 6.[3] Such limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.* This provision allows "patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function . . . ." *Williamson v. Citrix Online, LLC¸* 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).

The failure to use the word "means" creates a rebuttable presumption that means-plus-function claiming does not apply. *Id.* at 1348 (citing *Personalized Media Commc'ns., LLC v. Int'l Trade Comm'n*, 161 F.3d 696 703-704 (Fed. Cir. 1998)). To overcome this presumption, a challenger must show "that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Advanced Ground Info. Sys., Inc. v Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016). "To determine whether a claim recites sufficient structure, 'it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the terms covers a broad class of structures and even if the term identifies the structures by their functions.'" *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)).

---

[3] § 112 ¶ 6 was renamed as § 112(f) by the America Invents Act, Pub. L. No. 112-29, which took effect on September 16, 2012. Because the relevant patents in this case for purposes of the parties' means-plus-function disputes (the Color Match Patents) were issued before the America Invents Act took effect, § 112 ¶ 6 will be considered in this case.

### C. *Indefiniteness Under 35 U.S.C. § 112 ¶ 2*

A patent's specification must conclude "with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."  35 U.S.C. § 112(b); *see also* 35 U.S.C. § 112 ¶ 2 (2006).  In order to meet this "definiteness" requirement, "a patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  The Supreme Court in *Nautilus* emphasized that patents must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them," while recognizing that absolute precision is unobtainable given "the inherent limitations of language."  *Id.* at 899, 910 (quoting *Markman*, 517 U.S. at 373).

General claim construction principles apply to indefiniteness challenges, but the burdens are slightly different.  *See Enzo Biochem, Inc.* v. *Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("In the face of an allegation of indefiniteness, general principles of claim construction apply") (internal quotations and citations omitted).  While courts construing claim language sit in relative equipoise, a patent is "presumed valid under 35 U.S.C. § 282."  *Biosig Instruments, Inc.* v. *Nautilus, Inc. ("Nautilus III")*, 783 F.3d 1374, 1377 (Fed. Cir. 2015).  "[C]onsistent with that principle, a fact finder is instructed to evaluate . . . whether an invalidity defense has been proved by *clear and convincing evidence.*"  *Id.* (quoting *Microsoft Corp.* v. *i4i Ltd. P'ship*, 564 U.S. 91, 111 (2011)) (emphasis added, brackets removed); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007) ("Because a patent is presumed to be valid, the evidentiary burden . . . is one of clear and convincing evidence.").

## III.  <u>ANALYSIS</u>

### A. *Aquastar's Patent*

#### 1. "<u>annular chamber</u>" ('103 Patent, Claims 1, 8)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
| --- | --- |
| A somewhat round part of the body of the sump drain that generally encloses a space or cavity in the sump drain. | A somewhat round ring-shaped chamber that is connected to a pipe fixture |

The Court previously construed the term "annular chamber" to mean "a some-what round piece that is connected to a pipe fixture" in its Order Denying Plaintiff's Preliminary Injunction.

*See* Docket No. 41 at 6; *see also* Docket No. 42.  While the Court has already construed this term (but not in the context of a *Markman* hearing), it specifically noted that "[t]he Court's initial claim construction is tentative and non-binding."   *Id.*   With a more developed record, the Court readdresses the construction of this term.

The term "annular chamber" appears in asserted independent Claims 1 and 8.  Claim 1 states,

> 1.   A sump drain for installation in a surface of a swimming pool or spa having a drain inlet, the sump drain comprising:
> an *annular chamber* for embedding in the surface;
> the *annular chamber* having a contiguous annular top opening defining an outer sidewall portion;
> a central hub disposed radially inward from the *annular chamber*, the central hub in open communication with the *annular chamber*, and the central hub for embedding in the surface of the swimming pool or spa and coupling to the drain inlet;
> the *annular chamber* being centered radially around the central hub, and the *annular chamber* being formed with a gutter on the outer sidewall portion for embedded anchoring in the surface of the swimming pool or spa; and
> a removable cap above the central hub for accessing the drain inlet;
> wherein the contiguous annular top opening is defined to contiguously extend fully about the central hub and remain substantially flush with the surface when the sump drain is installed in the swimming pool or spa.

'103 Patent, Claim 1 (emphasis added).

Claim 8 states,

> 8.   A sump drain for installation in a surface of a swimming pool or spa having a drain inlet embedded in the surface of the swimming pool or spa, the sump drain comprising:
> an *annular chamber* having a contiguous annular top opening defining an outer sidewall portion, the contiguous annular top opening being defined to contiguously extend fully about the drain inlet;
> a ring shaped grid cover covering the contiguous annular top opening, the ring shaped grid cover defining a plurality of slots;
> the *annular chamber* being in open communication with the ring shaped grid cover slots and the drain inlet, the *annular chamber* being formed with a gutter on the outer sidewall portion for embedded anchoring in the surface of the swimming pool or spa; and
> a removable cap surrounded by the ring shaped grid cover, the removable cap disposed above the drain inlet.

'103 Patent, Claim 8 (emphasis added).

The parties dispute whether the term "annular" requires a ring shape with an open center, or merely requires some generally circular shape, such as a bowl.  Although Aquastar argues that a broader understanding of the term should govern, a plain English understanding of the term "annular" is not coextensive with the term "circular."  Indeed, both parties submit dictionary definitions for the term "annular" that support the conclusion that the term "annular" requires a ring shape, *i.e.*, a cut-out in the middle.  *See Merriam-Webster*, www.merriam-webster.com/dictionary/annular (last visited May 30, 2018) (Aquastar's submitted dictionary definition, defining "annular" as "of, relating to, or forming a ring"); *Random House Unabridged Dictionary* 84 (2nd ed. 1993), Docket No. 63-7 at 3 (Color Match's submitted dictionary definition, defining "annular" as "having the form of a ring.").  As it did in preliminary injunction briefing, Aquastar also continues to rely on a Federal Circuit decision involving a different patent relating to different technology where the panel construed the term "annular" as "of or relating to an area formed by two concentric circular or curved regions."  *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006).  But this definition, requiring two concentric circular or curved regions, is consistent with a ring requirement; it essentially means a circle inside of a circle is required to create an annular shape.

The embodiments disclosed and described in the '103 Patent refer to the term "annular chamber" consistent with this plain and ordinary understanding of the phrase.  Each of the embodiments disclosed in the '103 Patent depict a perfectly circular, enclosed ring-shaped chamber with an opening in the middle (where a "hub" is located).  *See, e.g.*, '103 Patent, Figures 1-16.  To support its argument for a broader construction, Aquastar refers to a portion of the specification that states, "the drain **10** has an annular ring-shaped body or chamber **12** although optionally the drain **10** *may be other preferably rounded shapes such as oval or merely with rounded corners* (not shown)."  *Id*. at 3:24-28 (emphasis added).  But Aquastar misses a key aspect of this statement: "***the drain* 10** may be other preferably rounded shapes such as oval or merely with rounded corners (not shown)."  *Id.*  Both parties appear to agree that the claimed annular chamber of the '103 Patent need not be perfectly circular, which is consistent with this passage because it would allow the annular chamber to fit whatever particular drain shape is involved.  However, the fact that the drain (and corresponding annular chamber) can be rounded shapes such as oval or merely have rounded corners is a different issue from whether the annular chamber must still be a ring with some sort of opening in the middle, albeit an oval ring or a rectangular ring with

rounded corners.  Thus, Aquastar has failed to identify language in the specification showing that the inventors intended to broaden the plain meaning of the term "annular" as it proposes.

The parties' other core dispute is whether the annular chamber is required to be connected to a pipe fixture.  In describing pool drains "currently known in the art," the '103 Patent describes them as "including a chamber into which water flows . . . The chamber includes an opening, or outlet port, that connects to a pipe extending to the pool pump and filter apparatus."  '103 Patent at 1:49-54.  The preferred embodiment of the '103 Patent, however, alternatively discloses that the inner sidewall **14** of annular chamber **12** "has multiple openings or outlet ports **26** connecting to one or more conduits or pipes **28**."  '103 Patent at 3:41-42.



'103 Patent, Figure 1 (annotation added).

It is unclear whether Color Match's proposed construction (*i.e.*, the Court's preliminary construction in the preliminary injunction order), which uses the phrase "pipe fixture," is intended to be broad enough to cover an embodiment like the one shown in Figure 1 of the '103 Patent.  Assuming it is, the purpose of the annular chamber as described in the '103 Patent appears to be a means for water collection and delivery into the pool drain.  In this regard, it is logical that the annular chamber would somehow need to be connected to the rest of the drain and thus eventually connected to a pipe fixture.  However, even in the '103 Patent's preferred embodiment, the annular chamber is not required to connect via a pipe, but could alternatively connect via "conduits" or potentially through some other means.  Narrowing the meaning of the term such that an annular

chamber must always be directly connected to a "pipe fixture" would be inappropriate in light of this language in the specification.

The Court also finds it inappropriate to swap out the term "chamber" with Aquastar's proposed phrase "part of the body of the sump drain that generally encloses a space or cavity." The term "chamber" is a reasonably common term with a well-understood ordinary meaning, and Aquastar has not argued that the applicants departed from that ordinary meaning, nor explained why a fact-finder would be unable to understand this term.

For the reasons stated, the Court construes the term "annular chamber" as "a ring-shaped chamber that is circular, oval, or otherwise has rounded corners."

2.   "central hub" and "hub portion" ('103 Patent, Claims 1, 14, 18, 20)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| The center of the generally circular sump drain. | A central part from which other parts radiate. |

The terms "central hub" and "hub portion" were not preliminarily construed in the Preliminary Injunction Order.  *See* Docket No. 41 at 8-9 (noting that even though the parties purported to dispute the meaning of the term "hub," Aquastar's arguments focused on Color Match's interpretation of the term "intermediate portion").  The term "central hub" appears in Claim 1, which states, *inter alia*,

> 1.   A sump drain for installation in a surface of a swimming pool or spa having a drain inlet, the sump drain comprising:
>
> . . .
>
> a ***central hub*** disposed radially inward from the annular chamber, the ***central hub*** in open communication with the annular chamber, and the ***central hub*** for embedding in the surface of the swimming pool or spa and coupling to the drain inlet;
>
> . . .
>
> a removable cap above the ***central hub*** for accessing the drain inlet; wherein the contiguous annular top opening is defined to contiguously extend fully about the ***central hub*** and remain substantially flush with the surface when the sump drain is installed in the swimming pool or spa.

'103 Patent, Claim 1 (emphasis added).  The term "hub portion" appears in independent Claim 14 and dependent Claims 18 and 20.  Claim 14 states, *inter alia*,

> a ***hub portion*** coupled to the body assembly through the intermediate region to remain in open communication with the intake opening, the ***hub***

11

*portion* being configured to guide the water admitted through the intake opening to a filtering system of the pool or spa, the intake opening being defined to contiguously extend fully about the ***hub portion***.

*Id*. at Claim 14 (emphasis added).  Claim 18 further recites, "[t]he apparatus as recited in claim **14**, wherein the intermediate portion defines a plurality of radial conduits extending between the intake opening and the ***hub portion*** for guiding the water admitted by the intake opening radially inward." *Id*. at Claim 18 (emphasis added).  Claim 20, meanwhile, states, "[t]he apparatus as recited in claim 14, further comprising a removable cap covering the ***hub portion*** and disposed in substantially coplanar arrangement . . . ."  *Id*. at Claim 20 (emphasis added).

The parties' core dispute is whether the term "hub" as used in the '103 Patent must be construed as Color Match proposes, *i.e.* a central part from which other parts radiate, "like blades of a fan or spokes on a wheel."  Docket No. 69 at 2.

As Aquastar explains, the plain language of the independent claims do not include any requirement that other parts radiate from the hub.  A limitation involving radiating parts is specifically added by Claim 18 where it states that "a plurality of radial conduits extend[ ] between the intake opening and the hub portion for guiding the water . . . radially inward."  '103 Patent, Claim 18.  Color Match argues that claim differentiation is inapplicable in this case because its proposed construction does not require "conduits" and instead simply requires "parts."  Docket No. 66 at 3.  Color Match also argues that the plain meaning of "hub" itself assumes radiating parts, primarily referring on a dictionary definition and backing up its position based on the preferred embodiments disclosed in the specification.

Color Match's dictionary definition states in relevant part:

> 1. the central part of a wheel, as that part into which the spokes are inserted.
> 2. The central part or axle end from which blades or spokelike parts radiate on various devices, as on a fan or propeller. 3. A center around which other things revolve or from which they radiate; a focus of activity, authority, commerce, etc.; core.

*Random House Unabridged Dictionary* 929 (2nd ed. 1993), Docket No. 63-8 at 3.  Not all of these definitions require that other parts "radiate" from the hub.  Instead, the only overarching theme common in these definitions of "hub" is that a hub is central.

One particular problem with Color Match's dictionary definitions is that there is no indication that a person of skill in the art would find any of these particular definitions, including

12

those relating to radiating parts, relevant *in the field of pool drain covers* at the time of the invention.  Color Match opted not to submit an expert declaration on this point, and given the other broader common understanding of the term "hub" as simply a central part, there is not sufficient basis to limit the term to one of the specific "radiating" definitions.  Unlike the term "annular," the many industry-specific definitions for the term "hub" caution against relying on a dictionary definition with a narrower meaning.  As to Color Match's arguments about the scope of the intrinsic record, Color Match makes the same argument for which it faults Aquastar in the parties' claim construction disputes regarding the Color Match Patents: claim terms should not be limited based on the preferred embodiments disclosed in the patent specification absent some specific indication that limiting the term would be consistent with the intent of the patent applicant.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

Color Match also argues that Aquastar's construction "would merely declare that the 'generally circular' drain has a center, an inherent feature of every circle."  Dkt. 66 at 6.  Color Match expresses concerns that failure to include a radiating part requirement "would impose no structural limitation on the patented drain."  Docket No. 62 at 11.  Color Match also introduces a redundancy argument as to the term "central hub," arguing that a construction that merely identified the hub as the central portion of the drain would render the term "central" meaningless.  *Id.* at 12.   Dkt. 62 at 11:10-20.

The claim language itself provides detailed information about the structural relationship and function of the central hub/hub portion in comparison to the other aspects of the claimed drain.  Much of Color Match's concerns may also be resolved simply based on the Court's construction of "annular chamber" as requiring a ring shape for Claim 1 and by separate requirements in the claim language itself about the loop shape of the intake opening of Claim 14.  For instance, Claim 1 requires that the central hub is "disposed radially inward from the annular chamber" and is in "open communication" with the annular chamber.  The "contiguous annular top opening" also "contiguously extend[s] fully around the central hub."  *See* '103 Patent at Claim 1 ("the annular chamber having a contiguous annular top opening defining an outer sidewall portion").  Claim 14 requires that the hub portion is "coupled to" the body assembly through an "intermediate region."  It further requires the hub portion "to remain in open communication with the intake opening," with the intake opening to "contiguously extend fully about the hub portion."  In other words, although there is not a requirement of radiating parts, both Claims 1 and 14 require some

13

connection between the hub and the annular chamber as well as the requirement of an opening that surrounds the hub.  At the hearing, Color Match agreed with the Court's tentative decision and observed that this portion of the Court's analysis suggested but did not definitively state that the hub and annular chamber must be separate structural components of the claimed drain.  Aquastar did not respond to Color Match's comments on this point at the hearing, and the Court agrees with Color Match's assessment.  The language of the claims, which require a hub portion either in "open communication" with the annular chamber or "coupled to" the body assembly, by their very terms require that the hub be a unique structural component from other aspects of the claimed invention.

Aquastar's proposed construction, "[t]he center of the generally circular sump drain," inexplicably introduces information about the shape of the sump drain that appears unrelated to the structure of the hub.  Referring to the hub as the "center" of the drain also suggests that the hub need not have any other independent structure.  This position is contradicted by the plain language of the claims, which refer to the hub in relation to other aspects of the claimed drain.

On the current record, the Court finds both parties' proposed constructions unhelpful as to the meaning of the term "hub."  Given the detailed information describing the "hub" within the claim language itself, the Court declines to construe the term on the current record.

3.   "gutter" and "gutter portion" ('103 Patent, Claims 1, 8, 14, 19)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
| --- | --- |
| A trough-like structure or groove that collects water. | A channel for anchoring in the surface of the swimming pool or spa. |

The terms "gutter" and/or "gutter portion" appear in four of the asserted claims.  Claim 1, for instance, states in relevant part,

> 1.   A sump drain for installations in a surface of a swimming pool or spa having a drain inlet, the sump drain comprising . . .
> > the annular chamber being centered radially around the central hub, and the annular chamber being formed with a ***gutter*** on the outer sidewall portion for embedded anchoring in the surface of the swimming pool or spa . . . .

'103 Patent, Claim 1 (emphasis added).  Claim 8 states, *inter alia*, "the annular chamber being in open communication with the ring shaped grid cover slots and the drain inlet, the annular chamber being formed with a ***gutter*** on the outer sidewall portion for embedded anchoring in the surface of

14

the swimming pool or spa." *Id*. at Claim 8 (emphasis added). Claim 14 states, *inter alia*, "a **gutter portion** formed to extend about an outer sidewall of the body assembly for embedded anchoring in the water immersible surface." *Id*. at Claim 14 (emphasis added). Claim 19, which depends from Claim 14, states, *inter alia*, "the **gutter portion** forms a channel projecting radially outward relative to the outer sidewall of the body assembly and extending contiguously about the intake opening." *Id*. at Claim 19 (emphasis added).

There can be no real dispute that the plain language of each of the relevant claims require that the gutter/gutter portion serves the purpose of "embedded anchoring in the surface of the swimming pool or spa" / "embedded anchoring in the water immersible surface." Any dispute by Aquastar to the contrary would fall flat (and indeed Aquastar does not attempt to dispute this − *see* Docket No. 67 at 6). Instead, the disagreement is whether, as urged by Aquastar, in addition to providing anchoring, the gutter / gutter portion **must also** be intended to collect water. In this regard, Figure 11 of the '103 Patent "show[s] water stops **50**, **60** for stopping any water that intrudes between the sump **10** and plaster **42** into which sump **10** is embedded." *Id*. at 4:21-23.



*Id*. at Figure 11 (annotations added). The '103 Patent states,

> [i]n the preferred embodiment the water stop **50**, **60** is tray-shaped like a gutter or channel **52**, **62** and extends around the sump **10** ***to collect water seeping into cracks between the sump*** **10** and the plaster **42**. The water stop **50** ***also serves to anchor the sump*** **10** in the plaster **42**.

'103 Patent at 4:24-28 (emphasis added). According to the '103 Patent, "[e]ach water stop **50**, **60** preferably includes a horizontal shelf **54** and a vertical wall **56**, again ***to catch water migrating***

between the sump **10** and the plaster **42**, in which the sump **10** is installed." *Id.* at 4:34-37 (emphasis added). The '103 Patent states that the "water stop feature helps maintain the structural integrity of the surrounding plaster in the pool or spa floor for many years." *Id.* at 4:61-63.

Although these preferred embodiments depict examples where the gutter is configured such that it collects water, there is nothing in the claim language or specification of the '103 Patent that ***requires*** that a gutter/gutter portion as claimed always be configured such that it can collect water. As with other claim terms already construed as well as claim terms addressed *infra*, it is improper to limit the meaning of the terms gutter / gutter portion to incorporate limitations based on the preferred embodiments disclosed in the specification. As Color Match observed at the hearing, the patent applicants made the specific choice to include limitations related to anchoring in the claims, but chose to omit reference to a water collection function for the gutter/gutter portion. This observation supports the same conclusion.

With this point in mind, the Court does note, however, that the plain meaning of "gutter" implies a particular structural shape, such as a trough, groove, or channel that can catch, hold, or direct something. But the '103 Patent claims do not require that particular "something" to be water as opposed to simply plaster or some other material. Although it seems like a gutter, by virtue of its structural shape, would inherently ***be able to*** catch water regardless, the Court declines to construe the terms "gutter" / "gutter portion" to ***require*** water collection, as Aquastar urges.

At the hearing, Aquastar argued that it would be inappropriate to construe the term "gutter" to include an optional water collection aspect because doing so is "just not allowed in claim drafting." Aquastar conflates the requirements of claim drafting with the purpose of claim construction. Perhaps Aquastar is correct that in claim drafting, a patent applicant cannot claim optional features of its invention (it is not necessary for the Court to weigh in on this characterization of practice before the Patent Office). But in claim construction conducted during patent litigation, the goal is simply to provide clarification of the meaning claim terms so that they can be understood by a fact finder. In this case, a claim construction that explains that water collection is optional clarifies the parties' dispute and provides guidance to a fact finder regarding the meaning of this claim limitation.[4] For the same reason, even though it is redundant to state

---

[4] In the alternative, the Court could have declined to include language related to water collection in the construction at all, still finding in Color Match's favor on this dispute. However, given the amount of emphasis put on this dispute by the parties, the Court instead chooses to clarify the issue in its construction.

that the gutter anchors, including that information in a construction alongside the fact of optional water collection serves to provide full information about the scope of this claim term. Otherwise, it would be possible that a fact-finder would be confused by an optional reference to water collection and no reference to anchoring. In other words, a claim construction here clarifies that the gutter or gutter portion *must* anchor, and it *may* collect water.

Color Match states that it sees "no meaningful structural differences" between its proposal that a gutter be structurally described as a "channel" and Aquastar's proposal that a gutter be structurally described as a "trough or groove." Docket No. 62 at 9. Neither party has explained why it believes a fact finder would be unable to simply understand the terms "gutter" or "gutter portion." The parties did not address this aspect of their proposed constructions at the hearing, nor dispute this aspect of the Court's tentative construction. For the reasons stated, the Court construes the terms "gutter" and "gutter portion" as "a channel, trough, or groove that anchors and may also be able to collect water."

    4.  "removable cap" ('103 Patent, Claims 1, 8, 20)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| An overlaying covering structure or lid capable of being removed, or moved by lifting or taking away or off. | A removable cap covering a hub that remains on the drain apparatus after installation while the drain is in operation. |

The Court previously construed the term "removable cap" to mean "a removable cap covering a hub and intended to remain on the drain apparatus after installation while the drain is in operation" in its Order Denying Plaintiff's Preliminary Injunction. *See* Docket No. 41 at 7-8; *see also* Docket No. 42. While the Court has already construed this term (although not in the context of a Markman hearing), "[t]he Court's initial claim construction is tentative and non-binding." *Id.* With a more developed record, the Court readdresses the construction of this term.

Asserted Claims 1, 8, and 20 recite slight variations of the term "removable cap." Claim 1 states, *inter alia*, "a ***removable cap*** above the central hub for accessing the drain inlet . . ." '103 Patent, Claim 1 (emphasis added). Claim 8 states, *inter alia*, "a ***removable cap*** surrounded by the ring shaped grid cover, the ***removable cap*** disposed above the drain inlet." '103 Patent, Claim 8 (emphasis added). Claim 20, which depends from Claim 14, states, *inter alia*, "a ***removable cap*** covering the hub portion and disposed in substantially coplanar arrangement relative to the body assembly at the intake opening when installed in the water immersible surface." '103 Patent,

Claim 20 (emphasis added).

In the Court's tentative order, it observed, based on the parties' briefing, that the parties appeared to be in agreement that the cap covers the "hub" or "drain inlet."[5] *See* Docket No. 70 at 3 ("Thus, the cap covers the hub."); Docket No. 66 at 5 ("the cap must cover the hub, sealing it off.") (citations omitted). Although Aquastar's proposed construction does not include the requirement that the cap cover the hub or drain inlet, this apparent agreement was based on multiple statements in Aquastar's briefs referring to the cap as a component that covers the hub. Docket No. 64 at 14 ("The purpose of the cap is to cover yet enable convenient removal for assessing and clearing debris from inside the sump drain."); Docket No. 67 at 7 ("Aquastar's construal—an overlaying covering structure or lid capable of being removed, or moved by lifting or taking away or off—accurately defines the removable cap as claimed and described in the '103 Patent."); Docket No. 70 at 3 ("The removable cap appears in claims 1 and 8 of the '103 Patent as being above the central hub or drain inlet . . . Thus, the cap covers the hub."). Despite these repeated representations, at the hearing, Aquastar argued that references in its papers to the cap "covering" the hub were "a mistake." Aquastar stated that it did not agree with Color Match that, with respect to Claims 1 and 8, the cap is required to cover the hub.

Even assuming Aquastar's numerous references in its briefs to the cap covering the hub were all "mistakes," the real dispute between the parties still relates to a slightly separate issue: whether "covering" requires a sealed, closed connection. As the Court noted in its tentative order, it is not persuaded that the terms "covering" and "sealed" are coextensive. Moreover, the specification does not refer to the cap "sealing" the hub; it merely states that "the hub **30** includes a cap **34**." '103 Patent at 3:47-48. At the hearing, Color Match reiterated an analogy presented in its briefs where it compared the term "removable cap" as used in the '103 Patent to a cap for a person's head. Color Match explained that a cap fits snugly on the head and made a comparison to an umbrella, which also can be above a person's head, but is not "capping" a person's head. Docket No. 69 at 6. In other words, Color Match argued that the plain meaning of the word "cap" itself requires physical contact between two items as opposed to an item that can simply be above another item.

---

[5] The Court notes that although the parties sometimes refer in their briefs only to the "hub," Claim 8 recites, "the removable cap disposed above the *drain inlet*." Based on the parties' arguments, they appear to consider the "drain inlet" of Claim 8 as equivalent to the "central hub" or "hub portion" elements recited in the other claims.

The dictionary definitions cited by the parties, however, reveal that not all understandings of the word "cap" require a sealed, direct connection with the capped item.  *See, e.g.*, www.merriam-webster.com/dictionary/cap (last visited May 30, 2018).  As with the term "hub," these general purpose dictionaries are not particularly helpful because there are so many alternative definitions for the term "cap" depending on the particular context.  Even taking Color Match's analogy, a cap on a person's head is not impermeable to water or wind.  Indeed, many baseball caps have a hole in the back where someone can adjust the strap.  Although true that the preferred embodiments in the patent describe a removable cap "held on by a pair of flat head Phillips screws," '103 Patent at 51-52, there is no indication that the patent applicants intended this preferred embodiment to demonstrate the full scope of the term "removable cap."  It is also possible that even considering this preferred embodiment, water could still move into the hub/intake opening.  Tellingly, although they are extrinsic evidence from long before the time of the invention, the Color Match Patents also use the term "cap" to refer to preferred embodiments showing those patents' disclosed drain cover.  Although a top portion of the "cap **104**" is intended to be sealed off by plaster/aggregate, the cap in the preferred embodiment still includes open portions along the outer perimeter providing access to side surfaces so that water can move into the drain:



'586 Patent, Figure 4.  For these reasons, the Court declines to construe "removable cap" to require a sealed connection between the cap and the hub below it.  The Court, however, will provide clarification as to the meaning of the phrases "above the central hub" and "above the drain inlet" in Claims 1 and 8.  Despite Aquastar's representation of "mistakes" in its briefs, the plain meaning of "cap" generally includes a requirement that a cap cover another item.

The parties also dispute when the cap can be removed.  The specification describes "[t]he

top side of the hub **30** includes a cap **34** on which a manufacturer's logo, here ABC, may be displayed, and the cap **34** is removable for purposes of cleaning out the drain **10** should it become clogged with debris.  It's held on by a pair of flat head Phillips screws **36** (FIG. 5)." '103 Patent at 3:47-2. Figure 5 illustrates the removal of the cap (the cap shown with the "ABC" logo):



'103 Patent, Figure 5.  While the specification explains that the cap is "removable for purposes of cleaning out the drain," that does not necessarily mean that the cap cannot be removed for other purposes.  '103 Patent at 3:49–52.  That is, if one wanted to remove the cap for a purpose other than cleaning the drain, there is nothing in the specification prohibiting it.  Because there is nothing in the claims or specification limiting *when* the cap is "removable," the Court declines to import such a limitation into the term "removable cap."

The Court notes, however, that the specification draws a distinction between a temporary plaster cover that is used for installation and the removable cap.  '103 Patent at 3:54-4:3.  As noted in the Preliminary Injunction Order (Docket No. 41 at 6-7), the claims and specification of the

20

'103 Patent support the conclusion that the removable cap is not intended to be an aspect of the drain for installation only that is subsequently thrown away; it is an ongoing component aspect of the sump drain instead of a temporary part.  Aquastar appears to acknowledge this fact in its opening claim construction brief where it states, "[t]he purpose of the cap is to cover yet enable convenient removal for accessing and clearing debris from inside the sump drain."  Docket No. 64 at 14.  The parties did not address this aspect of the Court's tentative construction at the hearing.

Although the Court finds that no construction is necessary for the term "removable cap," it makes that finding (as with all of the claim terms herein) in light of the specific analysis and explanation provided in this section.  In order to clarify the relationship between the removable cap and other aspects of the claims, the Court construes the term "above the central hub" in Claim 1 as "covering the central hub" and "above the drain inlet" in Claim 8 as "covering the drain inlet."

5.  "predetermined anti-entrapment diametric extent" ('103 Patent, Claims 14, 15, 16)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| The diameter sufficiently large for a VGB-compliant sump drain. | Indefinite. |

The parties dispute whether the term "predetermined anti-entrapment diametric extent" is a term whose boundaries would be understood by a person of skill in the art at the time of the invention.  The parties focus a lot of their dispute on the beginning of the phrase – "predetermined anti-entrapment."  Where the parties (particularly Aquastar) could have really helped the Court would have been to start by explaining what the end of the phrase – "diametric extent" – means.  At most, Color Match suggests that the word "extent" could be linked to the word "anti-entrapment" when it asserts that the claims fail to specify "to what extent entrapment is prevented."  Docket No. 62 at 12.  Aquastar's proposed construction suggests without stating that the term "diametric extent" is a complex way of simply saying "diameter."

The claim language refers to "the intake opening forming a loop having a predetermined anti-entrapment diametric extent."  '103 Patent, Claim 14.  Claims 15 and 16 build on this by referring to the "predetermined anti-entrapment diametric extent" as defining a particular "diametric dimension."

But Claims 15 and 16 refer to different "diametric dimensions."  Claim 15, on the one

hand, recites:

> 15.  The apparatus as recited in claim 14, wherein the predetermined anti-entrapment diametric extent defines an inner diametric dimension of at least 18 inches approximately for the intake opening.

'103 Patent, Claim 15.  Claim 16, on the other hand, recites:

> 16.  The apparatus as recited in claim 15, wherein the predetermined anti-entrapment diametric extent defines an outer sidewall diametric dimension of approximately 21 inches about the intake opening.

'103 Patent, Claim 16.  In other words, the "diametric extent" of the intake opening does not appear to be related to a single diameter value.  Instead, the "diametric extent" of the intake opening is the diameter range of the loop of the intake opening, including from the inner diametric dimension of the intake opening to the outer sidewall diametric dimension of the intake opening.

This understanding is consistent with the specification's discussion of the preferred embodiment, where it explains, "the drain **10** has an annular ring-shaped body or chamber **12** . . . The chamber **12** has an inner sidewall **14** having a diameter of about 18 inches (dimension D as labeled in FIG. **7**) and outer sidewall **16** having an outside diameter of about 21 inches, and the depth of the chamber from top to bottom is about 3.5 inches."  '103 Patent, 24-32.



'103 Patent, Figure 1 (annotation added).  The red bracket added to Figure 7 below could be interpreted as the claimed "diametric extent" of the loop of the intake opening.

22



*Id.*, Figure 7 (annotation added).  At the hearing, despite receiving the Court's tentative views regarding the meaning of the term "diametric extent," Aquastar persisted in its argument that "diametric extent" could simply mean a single "diameter."  Despite the Court's thoughts in this Order about the meaning of this phrase given the context of the intrinsic record, Aquastar's position suggests ongoing uncertainty about the meaning of the phrase "diametric extent" that, in addition to concerns with the phrase "predetermined anti-entrapment" discussed *infra*, further supports a finding of indefiniteness.  In addition, Color Match observed that rectangular drains can be considered VGB compliant.  It is unclear how a "diametric extent" would be calculated for a rectangular drain with rounded corners, which would appear to be covered by the '103 Patent claims.

As mentioned, the parties focus not on "diametric extent," but on the phrase "predetermined anti-entrapment."  From a plain English perspective, these two words appear to simply describe the nature of the "diametric extent."  The diametric extent (diameter range or perhaps diameter) of the intake opening prevents "entrapment," and that "anti-entrapment" range is "predetermined."  As Aquastar notes, the '103 Patent emphasizes in the Background section that the pool drain industry underwent a significant change in 2007 with the passing of the Virginia Graham Baker Pool & Spa Safety Act ("VGB Act").  Indeed, the Background section begins by describing the incident that led to the VGB Act's passage:

> Twin 7-Year Old Virginia Graham Baker was the grand-daughter of former Secretary of State James Baker III.  In June 2002 she became stuck to the hot tub drain and was unable to pull herself free and drowned.  After her tragic death the family lobbied Congress for a law to require anti-entrapment drain covers and other safety measures.

'103 Patent, 1:18-23.   Aquastar bases its proposed construction on this language and other language in the '103 Patent emphasizing the importance of VGB-compliant drains.  In one of the preferred embodiments of the '103 Patent, for instance, the specification explains that the disclosed drain "is a safe, VGB compliant drain, large enough to be unblockable by a single person."  '103 Patent at 4:58-59; *see also* '103 Patent at 2:35-37 ("When the drain is installed the top opening is preferably substantially flush with the pool or spa floor, and being of sufficiently large size to be unblockable.").

Color Match challenges this aspect of Aquastar's construction on multiple grounds, including that: (1) it would be inappropriate to base a claim construction on a law because laws can be changed (and the VGB Act in particular indicates that each drain "shall conform to the ASME/ANSI A112.19.8 performance standard, *or any successor standard* . . ." 15 U.S.C. § 8003(b)); and (2) the diameter necessary for a VGB-compliant drain is highly variable and dependent on other aspects of the drain design.  Docket No. 62 at 13.

In its responsive claim construction brief, Aquastar states,

> [a]s provided in the VGB Act, unblockable drains such as the Full Circle® and Eclipse[TM] must be sized such that its "open area cannot be shadowed by the area of the 18" x 23" Body Blocking Element of the ASME/ANSI A112.19.8-2007 . . ." [Docket No. 64-7 (VGB Act § 1450.2 (Definitions))]. Even though other VGB-compliant elongate sumps may be only a few inches wide, they must be "of a sufficient length that the ports cannot be simultaneously blocked." ['103 Patent] at 1:67-2:1.  Regarding rounded-like sump drains that sit flush with a pool or spa floor, the diameter should be "at least 18 inches," falling within the unblockable category of sump drains as it relates to the VGB Act.  *Id.* at 2:20-22, 2:45-46, 3:29, 6:37-40 [citations to portions of '103 Patent referencing embodiments of drain having a diameter of about 18 inches].

Docket No. 67 at 8.  It is not clear from Aquastar's briefing whether it believes "elongate channel sumps" that are only a few inches wide should be covered by the "anti-entrapment diametric extent" phrase, or whether Aquastar believes only sump drains with an inner diameter of more than 18 inches should be covered by the claim phrase.

At the hearing, in response to speculation in the Court's tentative order regarding Aquastar's claim construction position, Aquastar requested that it be permitted to change its position to now argue that "predetermined anti-entrapment diametric extent" be construed to require a minimum inner diametric dimension of at least 18 inches.  In making this argument,

Aquastar failed to explain why a smaller VGB-compliant drain should not be covered by the '103 Patent, even though such drains are discussed in the '103 Patent specification. Aquastar did not clearly argue, for instance, that the claims of the '103 Patent only relate to a certain type of drain and that type of drain, in turn, is only VGB-compliant when it has a minimum diameter of at least 18 inches. Without further explanation as to why the '103 Patent discusses VGB-compliant elongate channel sumps (and why Aquastar would propose those sumps not be covered by the claims), Aquastar's new late proposal appears inadequate. Even assuming Aquastar has not waived its new proposal after submitting three claim construction briefs on the issue, with this critical logical step missing, there does not appear to be an appropriate explanation that would support Aquastar's new proposed construction of the claim term. As Color Match also observed at the hearing, given the uncertainty regarding the multiple different diameters (inner diameters versus outer diameters) that appear to be involved in a "predetermined anti-entrapment diametric extent," Aquastar's proposal may not fully address all of the relevant shortcomings regarding the proper scope of this claim term.

Color Match has presented clear and convincing evidence based on the patent intrinsic record to support its argument that the "predetermined anti-entrapment" phrase is indefinite. It has also explained why replacing that language with a requirement for "VGB compliance" or a minimum inner diameter of 18 inches leads to the same shortcomings as the claim phrase itself. Rather than provide rebuttal evidence that might have clarified the issues, Aquastar's position suggests a concession that an elongate sump drain can have a very small diameter and be VGB-compliant because of its length, or alternatively meet the requirements of the VGB Act by being at least 18 inches wide. This leaves a large grey area in between, with no explanation of whether, for instance, a 10-inch drain that is 10 inches deep would be VGB compliant in Aquastar's (or the patent's) estimation. After considering the patent intrinsic record and the parties' arguments, the Court finds that the contours of the claim language are not identified such that a person of skill in the art would be able to understand the boundaries of the meaning of the phrase "predetermined anti-entrapment diametric extent" with reasonable certainty.[6] These concerns are also aside from

---

[6] Although Aquastar has submitted an expert declaration to support its position regarding the interpretation of this claim term, the expert's statements are conclusory (spanning only a single short paragraph and merely regurgitating language from the VGB Act) and thus unhelpful as to whether a person of skill in the art would understand the meaning of this term. *See* Declaration of Rick English in Support of Plaintiff's Claim Construction Brief, Docket No. 64-1. Those statements are thus not considered as part of the Court's analysis.

some lingering uncertainty as to the meaning of the smaller phrase "diametric extent."

Accordingly, the Court finds the claim phrase "predetermined anti-entrapment diametric extent" indefinite.

Based on the Court's tentative order finding the term "predetermined anti-entrapment diametric extent" indefinite, at the hearing, Color Match proposed that it submit a partial final judgment as to the invalidity of Claim 14 and its dependent claims. In response to Color Match's proposal, Aquastar argued that other requirements of some of the dependent claims should preclude a finding that those claims are also invalid as indefinite. Aquastar specifically argued that Claims 15 and 16 of the '103 Patent, which include additional limitations relating to the term "predetermined anti-entrapment diametric extent," should not be found invalid. Additional briefing is necessary for the Court to make a determination on this issue. The Court **ORDERS** that within 14 days of this Order, Color Match may file a proposed partial final judgment and supporting brief not to exceed 5 pages explaining the basis for the scope of its proposed partial final judgment. Aquastar may file objections not to exceed 5 pages within 7 days of receiving Color Match's proposed partial final judgment and supporting brief.

6. "<u>intermediate region</u>" and "<u>intermediate portion</u>" ('103 Patent, Claim 14)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| Part of the body assembly of the sump drain defining a middle place between an intake opening and a hub portion of the sump drain. | A portion of the body assembly, which is separate from the intake opening and allows communication between the hub portion and the intake opening. |

Because the Court finds the term "predetermined anti-entrapment diametric extent" in Claim 14 of the '103 Patent indefinite, it is not necessary to construe the terms "intermediate region"/ "intermediate portion," which only appear in Claim 14.

To the extent the Court later determines that certain dependent claims of Claim 14 are not invalid as indefinite, it will return to consider the parties' dispute regarding the scope of these claim terms.

B. *Color Match's Patents*

1. "<u>drain member</u>" ('586 Patent, Claims 1-2) / "<u>drain cover</u>" ('035 Patent, Claims 1, 4, 7; '588 Patent, Claims 1, 4)

| | Aquastar's Proposed Construction | Color Match's Proposed |
|---|---|---|

|  |  | Construction |
|---|---|---|
| "drain member" | An apparatus without a sump, or pit or reservoir bowl. | A component of a pool drain assembly. |
| "drain cover" | An apparatus without a sump, or pit or reservoir bowl. | An apparatus meant to be put over a pool or spa drain opening. |

In February 2006, Color Match filed a suit against Aquastar before this Court alleging, *inter alia*, infringement of the same three patents it has asserted in counterclaims in this case. *Color Match Pool Fittings Inc v. Aquastar Pool Products Inc et al*, 2:06-cv-00781-GW-PLA (C.D. Cal. Feb. 10, 2006). On August 6, 2007, the Court held a claim construction hearing. In its one-page Minute Order, the Court construed four terms in the Color Match Patents without analysis, including the terms "pool drain member" and "drain cover." *See id.* at Docket No. 99 (Aug. 6, 2007) ("Pool drain member is a component of a pool drain assembly . . . Drain cover is defined as an apparatus meant to be put over a pool or spa drain opening"). The parties eventually settled the matter. *Id.* at Docket No. 224 (Sept. 8, 2008) (Order on Stipulation for Dismissal). Color Match now argues that issue preclusion should apply to these claim terms. *See, e.g.*, Docket No. 69 at 5. Color Match relies on a 2007 case from this District, *Curtiss-Wright*, to support its argument that a settlement constitutes a final judgment sufficient to create preclusive effect. *Id.* (citing *Curtiss-Wright Flow Control Corp. v. Z&J Techs.*, 563 F. Supp. 2d 1109, 1121-22 (C.D. Cal. 2007) (J. Otero)).

A recent opinion in this District has considered *Curtiss-Wright* and declined to apply its issue preclusion analysis in the claim construction context. *See Nichia Corp. v. VIZIO, Inc.*, SA CV16-00545 SJO (MRWx), Docket No. 127 (C.D. Cal. May 29, 2018). The court observed:

> "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citation omitted). Collateral estoppel applies when it is established that "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the first proceeding." *Id.* at 885.
>
>         *        *        *
>
> In *Curtiss-Wright* . . . this Court incorrectly failed to apply one of the tenets of issue based estoppel – that the prior court has decided an issue of fact or law necessary to its judgment. *See Hydranautics*, 204 F.3d at 885.

27

*          *          *

> To be sure, "[u]nder Ninth Circuit law, a court approved settlement is a final judgment on the merits for purposes of collateral estoppel." *Int'l Gamco*, 732 F. Supp. at 1091 (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir.2006)). In *Reyn's Pasta*, however, the Ninth Circuit explicitly found that the issues decided in the district court's ruling approving the class action settlement – that is, that the settlement released plaintiffs' claims and was "fair, reasonable and adequate" – were "necessary to the[] final judgment" and could therefore provide a basis for estoppel. 442 F.3d at 746. Here, even if the order approving the parties' settlement and dismissing the parties were to be treated as a final judgment, the various claim constructions determined by the district court would not be "necessary" to the order, as the district court would likely have approved the dismissal regardless of whether claim construction had occurred or not. For these reasons, the Court declines to extend its holding in *Curtiss-Wright* concerning collateral estoppel to the extent that it failed to consider whether the claim construction at issue was necessary to its approval of the parties' settlement.

*Id.* at 11-12. For the same reasons provided in *Nichia*, the Court declines to apply issue preclusion under the circumstances presented by the parties in this matter.

The term "drain member" appears only in the claims of the '586 Patent, the oldest of the three Color Match Asserted Patents. Asserted Claim 1 of the '586 Patent states,

> 1. ***A pool drain member*** adapted to be positioned over an drain opening in a pool wherein the pool drain member includes an upper surface and at least one side surface wherein the at least one side surface includes at least one opening permitting fluid communication therethrough to the drain opening and **wherein *pool drain member* includes a retaining member** positioned adjacent the upper surface of the pool drain member such that the retaining member retains aggregate material on the upper surface of the pool drain member.

'586 Patent, Claim 1 (emphasis added). The '035 Patent and '588 Patent use the term "drain cover" in a similar fashion. Asserted Claim 1 of the '035 Patent, for instance, recites:

> 1. ***A drain cover*** adapted to be positioned over a drain opening in a pool wherein the ***drain cover comprises*** an upper surface and a side surface wherein the side surface includes at least one opening permitting fluid communication therethrough to the drain opening, wherein a section of the upper surface is recessed so as to define a cavity region wherein the cavity region retains aggregate material so as to provide the upper surface of the drain cover

'035 Patent, Claim 1 (emphasis added). Asserted Claim 1 of the '588 Patent recites:

> 1. ***A drain cover*** adapted to be positioned over a drain opening in a pool

28

> wherein the **drain cover comprises** an upper surface and a side surface wherein the side surface includes at least one opening permitting fluid communication therethrough to the drain opening, wherein a section of the upper surface is recessed so as to define a cavity regions wherein a layer of aggregate material is positioned adjacent the cavity region in a manner so as to provide the drain cover with the appearance of having an aggregate finish.

'588 Patent, Claim 1.

Aquastar's proposed construction, which would add a negative limitation to the claims, finds no support in the patent intrinsic record. Indeed, the Color Match Patents nowhere even use the terms "sump," "pit," or "reservoir bowl." Aquastar essentially admits that its proposed construction is part of a defensive tactic based entirely on the nature of its accused product and its understanding of changes in the pool drain industry since the Color Match Patents were filed. Claim construction, however, must be focused first and foremost on the claims as read in view of the patent intrinsic record. Aquastar can consider other arguments, such as under 35 U.S.C. § 112 ¶ 1, at the appropriate time if it feels that the claims of the Color Match Patents have been construed beyond the scope disclosed in the relevant specification.

In its briefs, Aquastar alternatively suggests that because the background section of the Color Match Patents refer to anti-vortex drain covers, the meaning of these claim terms should be limited as only applicable to conventional anti-vortex drain covers of the era. Even if Aquastar had sought a proposed construction that aimed to directly limit the meaning of "drain member" and "drain cover" to anti-vortex drain covers (as opposed to its defense tactic proposal of "an apparatus without a sump, or pit or reservoir"), such a proposal would remain unpersuasive. Although the background of the invention refers to designs for anti-vortex drains and covers (*see, e.g.*, '035 Patent at 1:39-42) and the preferred embodiment of the '586 Patent describes its design as relevant to anti-vortex drain covers, there is no suggestion that the inventors intended the invention disclosed in the Color Match Patents to be specifically limited for use only to these types of drain covers. Indeed, the '586 Patent explains, "[w]hile the aggregate retaining device **124** of the preferred embodiment is adapted for an anti-vortex drain cover, it can be appreciated that the retaining device **124** can be configured for a wide variety of other types of drain covers without departing from the scope of the invention." '586 Patent at 5:43-48. Thus, the patent intrinsic record supports the conclusion that it would be inappropriate to limit the scope of the claims to this preferred embodiment. *See also Hill-Rom*, 755 F.3d at 1371 ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent

29

must be construed as being limited to that embodiment.").

The Court, however, agrees that "drain member" should be construed coextensively with "drain cover." The term "drain member" appears nowhere in the specifications of the Color Match Patents. The Field of the Invention for the Color Match Patents "relates to drain covers for swimming pools and spas, and more particularly to an apparatus for applying an exposed aggregate or plaster finish to the top surface of drain covers." '035 Patent at 1:14-17. The term "drain member" is also used in exactly the same way in the '586 Patent claims as the term "drain cover" is used in the '035 Patent and '588 Patent claims.

As far as a further construction for these terms, however, the Court finds Color Match's proposed construction for "drain cover" redundant of the language in the claims themselves. Because the relevant asserted claims already explain that the claimed drain cover/member is "adapted to be positioned over a drain opening in a pool," it is unnecessary to include that information in a construction for either term.

Based on its review of the parties' arguments and the intrinsic record, the Court construes the term "drain member" as "drain cover." The Court finds that no construction is necessary for the term "drain cover."

2. "<u>retaining member</u>" ('586 Patent, Claims 1-2)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| [Governed by 35 U.S.C. § 112 ¶ 6]<br><br>An aggregate retaining device having an inwardly sloping sidewall or angled ring around the device, or structural equivalents thereof, i.e. some structural means for encircling a topmost surface of a drain cover in order to retain a certain amount of an aggregate or plaster finish material over the top of the topmost surface of the drain cover and structural equivalents thereof. | A component located adjacent to the upper surface of the drain member that retains aggregate material on that upper surface. |

Claim 1 of the '586 Patent states, *inter alia*, "wherein pool drain member includes a ***retaining member*** positioned adjacent the upper surface of the pool drain member such that the ***retaining member*** retains aggregate material on the upper surface of the pool drain member." '586 Patent, Claim 1 (emphasis added). Claim 2 of the '586 Patent states,

2. The pool drain member of claim **1**, wherein the ***retaining member***

> extends about an outer perimeter of the upper surface of the pool drain member so as to define a cavity in which the aggregate material can be positioned and wherein the ***retaining member*** exerts a force against the aggregate material to retain the aggregate material in the cavity adjacent the upper surface.

'586 Patent, Claim 2 (emphasis added).

Aquastar argues in a conclusory fashion that 35 U.S.C. § 112 ¶ 6 should be applied in interpreting the meaning of "retaining member."  Aquastar's Opening Claim Construction Brief devotes just two sentences to its position that § 112 ¶ 6 applies, stating, "[a]lthough the claims state the function of the 'retaining member,' it does not describe the corresponding structure of the member.  Thus, a means-plus-function limitation analysis is warranted."  Docket No. 64 at 22; *see also* Docket No. 67 at 14 (stating only "[t]he word 'retaining' is a verb and describes a function rather than a device, and the words 'retaining member' alone do not describe a device known in the pool and spa industry, such as a skimmer.  Thus, a means-plus-function interpretation is warranted[.]").

As Color Match observes, when a claim term does not use the word "means," there is a rebuttable presumption that § 112 ¶ 6 does not apply.  *Williamson¸* 792 F.3d at 1348.  It is Aquastar's burden to overcome that presumption if it seeks to invoke § 112 ¶ 6.  Through its conclusory statements, Aquastar fails to meaningfully consider Claim 1's description of the retaining member in structural terms as being "positioned adjacent the upper surface of the pool drain member."  Claim 2 further describes structural aspects of the claimed retaining member, including that it "extends about an outer perimeter of the upper surface of the pool drain member so as to define a cavity."

The '586 Patent specification similarly uses the phrases "retaining member" consistently to connote structure.  The Background of the Invention section of the '586 Patent refers to "a need for a drain cover for swimming pools or spas that is less conspicuous.  To this end, there is a particular need for an apparatus or a method for matching a drain cover to the surrounding surface."  '586 Patent at 2:6-10.   Immediately following in the Summary of the Invention section, the '586 Patent explains,

> [t]he aforementioned needs are satisfied by the apparatus for ***forming an exposed aggregate or plaster surface finish on drain covers of the present invention***. In one aspect, the apparatus of the present invention comprises an ***aggregate retaining member*** wherein the retaining member is positioned

31

> adjacent an upper surface of a pool drain cover *such that the retaining member retains aggregate material <u>on the upper surface of the pool drain cover</u>*.

'586 Patent, 2:13-18.  The '586 Patent proceeds to describe the retaining member in relation to the upper surface of the pool drain cover.  Although Aquastar characterizes the phrase "retains aggregate material on the upper surface of the pool drain member" as functional, this language also inherently provides information about the structure required to accomplish such a function.

Moreover, in later portions of the '586 Patent specification, the term "retaining device" is used in the same way as the term "retaining member," suggesting that the two terms are interchangeable.  *Id.* at 6:18-10 ("The aggregate retaining device **124** retains the aggregate material as a result of the aggregate material being positioned adjacent the upper surface **116** of the cover **104**.").  Aquastar has not separately argued, either in its briefs or at the hearing, that the phrase "retaining device" fails to connote structure.

At the hearing, Aquastar quickly re-urged its argument that the "retaining member" term is a means-plus-function limitation.  However, immediately after restating its position, Aquastar used a demonstrative PowerPoint slide identifying a figure of the Color Match Patents (Figure 5).  Aquastar stated that the figure depicted a "retaining member" and explained that the figure showed that the retaining member included sidewalls so that plaster/aggregate could be placed across substantially the entire surface of the retaining member.  In other words, Aquastar immediately identified the structural aspects of the retaining member consistent with the requirements of the claims and undercut its argument that the term "retaining member" is a means plus function limitation.

After considering the patent intrinsic record and the parties' competing arguments, the Court finds Aquastar has failed to meet its burden overcoming the presumption against means-plus-function claiming as to this term.

On the other hand, Color Match's proposed construction is again unhelpful as it merely repeats the language of Claim 1 in the construction itself.  Accordingly, the Court concludes that no construction is necessary for the term "retaining member."

    3.   "side surface" ('586 Patent, Claim 1; '035 Patent, Claim 1; '588 Patent Claim 1)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| An outer surface forming a sidewall of the | A generally vertical surface having at least one |

| drain cover/member above the pool surface, through which water enters and travels to the drain opening. | opening through which fluid may flow. |
|---|---|

The term "side surface" appears in asserted claims for all three of the Color Match Patents. The claims generally include variations of the phrase "wherein the [pool drain member includes / drain cover comprises] an upper surface and a[t least one] side surface wherein the [at least one] side surface includes at least one opening permitting fluid communication therethrough to the drain opening." '586 Patent, Claim 1; '035 Patent, Claim 1; '588 Patent Claim 1.

Color Match argues that Aquastar is improperly seeking to import two limitations into the claims without basis. *See* Docket No. 66 at 14. Aquastar's proposed construction would require: (1) that the sidewall must be "above the pool surface," and (2) that the side surface is the component "through which water enters and travels to the drain opening."

Like some of Aquastar's other claim construction arguments, Aquastar's position regarding the meaning of the term "side surface" is based on an argument that the '586 Patent only discloses a retaining device "meant to fit *prior-art conventional drain covers*." Docket No. 67 at 16 (emphasis in original). Based on this narrowed interpretation of the intrinsic record, Aquastar argues that because all prior art conventional drain covers at the time of the '586 Patent were anti-vortex drain covers disposed above the pool or spa floor, the scope of the claims must be similarly limited. Although the '586 Patent provides context to the invention by explaining that at the time of the invention, "the standard drain cover currently used for most swimming pools is a circular anti-vortex drain cover," the '586 Patent does not go on to state that the inventors intended to limit their concept to be applicable solely to modifying those prior art drain covers. Indeed, as previously explained in the context of the "drain member" / "drain cover" terms, the opposite is true. The '586 Patent explains, "[w]hile the aggregate retaining device **124** of the preferred embodiment is adapted for an anti-vortex drain cover, it can be appreciated that the retaining device **124** can be configured for a wide variety of other types of drain covers without departing from the scope of the invention." '586 Patent at 5:43-48. Again, it appears Aquastar's arguments may be more relevant in the context of a 35 U.S.C. § 112 ¶ 1 dispute than they are at the claim construction stage. Because Aquastar's first argument – that the sidewall must be "above the pool surface" – is linked to its argument attempting to improperly limit the scope of the claim to the preferred embodiment, it is rejected. *Hill-Rom*, 755 F.3d at 1372-73 (Fed. Cir. 2014) (finding that where

nothing in intrinsic record purported to specifically limit the invention, "we do not import limitations from the specification into the claims.")

Regarding the parties' second dispute, the parties appear to agree that water can travel through the side surface, as this is stated in the claim language itself. The parties' dispute is more refined, relating to whether the side surface must be an outer surface that provides the point of *initial* water intake for the drain cover. Specifically, Color Match seeks a broader construction, arguing that "the claim language permits water to enter the drain through another opening, as long as the water ultimately reaches and passes through an opening in the side surface." Docket No. 66 at 15. As with Aquastar's first argument, Aquastar ties its second argument to its position that the claim terms should be limited based on the preferred embodiment in the patent specification. Aquastar's argument is again rejected, as there are "no words of manifest exclusion or restriction" in the patent specification that would support limiting the meaning of the term "sidewall" to the preferred embodiment. *Hill-Rom*, 755 F.3d at 1372. The Court notes, however, that Color Match's position in its brief that water can "enter the drain through another opening, as long as the water ultimately reaches and passes through an opening in the side surface," could be interpreted as inconsistent with the claim language, which requires the opening in the side surface to "permit[ ] fluid communication *therethrough to the drain opening*." In other words, the claims require that to the extent water passes through the opening in the sidewall, it does so *before* it has passed through the drain opening and *in order to reach* the drain opening.

At the hearing, Color Match sought clarification regarding this aspect of the Court's tentative order, arguing that there is a distinction between a "drain opening" of a pool and an "intake opening" of a pool drain cover apparatus. Color Match argued that the "drain opening" is simply access to the drain pipe, while an "intake opening" is the initial entrance to the pool drain apparatus. Although the phrase "intake opening" does not appear in the Color Match Patents, Color Match's understanding is generally consistent with the embodiments disclosed in the Color Match Patents. For instance, in describing Figure 1 of the Color Match Patents, which is referred to as "a conventional anti-vortex drain cover assembly **100**," the specification explains that it "is commonly used to cover drain openings of swimming pools and spas." '588 Patent at 4:9-11. This cover assembly **100** includes a base **102** that "defines a central opening **105**." *Id.* at 4:17-18. The Color Match Patents explain, "[t]he side walls **106** of the base member **102** are typically positioned within a drain opening in the pool or spa such that water can flow through the central opening **105**

into the drain." *Id.* at 4:18-21.  The Color Match Patents further state that in one embodiment, "water from the pool is directed to flow through the side openings **118** of the cap **104** and down the drain." *Id.* at 4:50-52.  Based on this disclosure, the Court agrees with Color Match that the claims' requirements that water pass through the "side surface" to the drain opening is distinct from a requirement that water must initially pass through the side surface to some other opening in the drain cover assembly itself.

Again, Color Match's proposed construction is largely redundant of the claim language. Color Match also includes the language "generally vertical surface" based on a review of one of the figures of the Color Match Patents.  Docket No. 62 at 21 ("The only surface with openings shown in the specifications is the generally vertical surface with openings labelled 118 in Figure 1, reproduced below.").  Particularly where each of the relevant claims already recites both an "upper surface" and a "side surface," and the term "side" has a well-known plain and ordinary meaning, the Court is not persuaded that Color Match's proposed construction is necessary to inform the fact finder as to the meaning of the term "side surface."

Accordingly, the Court finds that no construction is necessary for the term "side surface" in the Color Match Patents.

4.  "<u>cavity region</u>" ('035 Patent, Claim 1; '588 Patent, Claim 1)

| Aquastar's Proposed Construction | Color Match's Proposed Construction |
|---|---|
| A recessed space defined by the topmost surface of a drain cover necessarily elevated above the pool floor and a retaining device sidewall, and extending substantially across the upper surface of the drain cover.[7] | A recessed region of the upper surface. |

Instead of the "retaining member" limitation, Color Match's two more recently-issued patents each require that the upper surface of the drain cover include a "cavity region."  For instance, Claim 1 of the '035 Patent states, "wherein a section of the upper surface is recessed so as to define a cavity region wherein the cavity region retains aggregate material so as to provide the upper surface of the drain cover with an aggregate finish."  '035 Patent, Claim 1.  Claim 1 of the '588 Patent includes similar language, stating, "wherein a section of the upper surface is

---

[7] In the parties' Amended Joint Claim Construction and Prehearing Statement, Aquastar's original proposed construction reads "[a] recessed space defined by the topmost surface of a drain cover and a retaining device sidewall, and extending substantially across the upper surface of the drain cover." Docket No. 56, Ex. C at 4.

recessed so as to define a cavity regions wherein a layer of aggregate material is positioned adjacent the cavity region in a manner so as to provide the drain cover with the appearance of having an aggregate finish."  '588 Patent, Claim 1.

Aquastar again maintains its position that the scope of the Color Match Patents is limited to describing drain covers for conventional anti-vortex drains that include an elevated portion above the pool or spa floor.  For the same reasons previously discussed with respect to the terms "drain cover/member" and "side surface," Aquastar's arguments in this vein are rejected.  To repeat, the Color Match Patents specifically state that "[w]hile the aggregate retaining device **124** of the preferred embodiment is adapted for an antivortex drain cover, it can be appreciated that the retaining device **124** can be configured for a wide variety of other types of drain covers without departing from the scope of the invention."  '035 Patent at 5:35-38; *see also id.* at 6:53-55 ("While the device of the present invention is adaptable to any drain cover having a general top surface, the device can also be made as an integral part of a drain cover assembly in other embodiments of the invention.").  The intrinsic record does not support limiting the claims based on the specification and the disclosed preferred embodiment.  *Hill-Rom*, 755 F.3d at 1371.

Aquastar's proposed construction would also require that the cavity region "extend[] substantially across the upper surface of the drain cover."  Aquastar explains that this requirement is based on the Color Match Patents' stated goals for the invention.  Namely, the Color Match Patents describe that the goal of the invention is to create a drain cover that matches the surrounding surface.  *See, e.g.*, '035 Patent at 2:16-17.  As Color Match notes, however, the relevant claims of the '035 Patent and '588 Patent specifically state that "a ***section*** of the upper surface is recessed so as to define a cavity region."  Indeed, dependent claims of the patents specifically provide further information about the scope of the upper surface comprised of the cavity region.  Specifically, Claim 3 of the '035 Patent requires that "the cavity region extends from the center of the upper surface to the outer perimeter of the upper surface of the drain cover."  '035 Patent, Claim 3; *see also* '588 Patent, Claim 3 (same).  Under the doctrine of claim differentiation, it would be inappropriate to limit Claim 1 of the '035 Patent and Claim 1 of the '588 Patent to include a similar "extending substantially across the upper surface of the drain cover" requirement.

Again, Color Match's proposed construction is redundant and unilluminating and will not be adopted in a construction.

No construction is necessary for the term "cavity region."

## CONCLUSION

For the reasons stated, the Court would adopt the following constructions for the disputed claim terms:

| Term | Court's Construction |
|---|---|
| "annular chamber"<br><br>('103 Patent, Claims 1,8) | "a ring-shaped chamber that is circular, oval, or otherwise has rounded corners." |
| "central hub" and "hub portion"<br><br>('103 Patent, Claims 1, 14, 18, 20) | No construction |
| "gutter" and "gutter portion"<br><br>('103 Patent, Claims 1, 8, 14, 19) | "a channel, trough, or groove that anchors and may also be able to collect water" |
| "removable cap"<br><br>('103 Patent, Claims 1, 8, 20) | No construction; however, the Court construes the term "above the central hub" in Claim 1 as "covering the central hub" and "above the drain inlet" in Claim 8 as "covering the drain inlet." |
| "predetermined anti-entrapment diametric extent"<br><br>('103 Patent, Claims 14, 15, 16) | Indefinite |
| "intermediate region" and "intermediate portion"<br><br>('103 Patent, Claim 14) | Construction of this term reserved, if necessary, until after determination is made regarding validity of dependent claims of Claim 14 |
| "drain member"<br><br>('586 Patent, Claims 1-2) | "drain cover" |
| "retaining member"<br><br>('586 Patent, Claims 1-2) | No construction necessary |
| "side surface"<br><br>('586 Patent, Claim 1; '035 Patent Claim 1; '588 Patent, Claim 1) | No construction necessary |

| Term | Court's Construction |
| --- | --- |
| "drain cover"<br><br>('035 Patent, Claims 1, 4, 7; '588 Patent, Claims 1, 4) | No construction necessary |
| "cavity region"<br><br>('035 Patent, Claim 1; '588 Patent, Claim 1) | No construction necessary |